**FRIENDS OF THE WILD SWAN, INC., Alliance for the Wild Rockies Inc., Ecology Center, Inc., American Wildlands, Inc., Montana Environmental Information Center Inc., Plaintiffs,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Carol Browner, Administrator, Jack McGraw, Region VIII EPA Administrator, Defendants,**

and

**State of Montana, ex rel. Department of Environmental Quality, Montana Wood Products Association, Montana Stockgrowers Association, and Montana Farm Bureau Federation, Intervenors.**

No. CV 97–35–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Nov. 7, 2000.

Jack R. Tuholske, Missoula, MT, Jory Ruggiero, Bozeman, MT, for Friends of the Wild Swan, Alliance for the Wild Rockies, Ecology Center Inc., American Wildlands, plaintiffs.

Claudia L. Massman, Montana Department of Environmental Quality, Helena, MT, Jack R. Tuholske, Missoula, MT, Jory Ruggiero, Bozeman, MT, for Montana Environmental Information Center Inc., plaintiff.

Deanne L. Sandholm, Office of the U.S. Attorney, Helena, MT, Daniel R. Dertke, U.S. Department of Justice—Environmental Defense Section, Washington, DC,

Margaret J. Livingston, Associate Regional Counsel, U.S. Environmental Protection Agency, Denver, CO, for U.S. Environmental Protection Agency, Carol M. Browner, Jack Region VIII EPA Administrator, defendants.

John F. North, Claudia L. Massman, Montana Department of Environmental Quality, Helena, MT, Jane Amdahl, Dept. of Environmental Quality, Helena, MT, for State of Montana, ex rel. Department of Environmental Quality, intervenor defendant.

Rebecca W. Watson, Jeffrey M. Hindoien, Gough, Shanahan, Johnson & Waterman, Helena, MT, for Montana Wood Products Association, intervenor defendant.

Rebecca W. Watson, Jeffrey M. Hindoien, Gough, Shanahan, Johnson & Waterman, Helena, MT, John E. Bloomquist, Doney Crowley & Bloomquist, Helena, MT, for Montana Stockgrowers Association, Montana Farm Bureau Federation, intervenor defendants.

## ORDER

MOLLOY, District Judge.

### I. Procedural Background

*A. Violation & Remedy*

Over one year ago, on November 4, 1999, I granted Defendants summary judgment on Counts I and III and most of Count II of the complaint in this action. For the most part, Defendants have prevailed in this case. I did grant Plaintiffs summary judgment on one part of Count II of the Complaint, a claim that the Administrative Procedures Act (APA) was violated. I found that the EPA acted arbitrarily and capriciously when it did not disapprove Montana's feeble submission of 130 total maximum daily load calculations (TMDLs) out of the 900 water quality limited segments (WQLSs) the State had identified by 1998. *See* 5 U.S.C. 706(2)(A).

Because the EPA violated the Administrative Procedures Act, remand to the EPA was the appropriate remedy. Remand was the least intrusive means of redressing the EPA's failure to consider the pace of TMDL development while continuing to honor the agency's discretion in overseeing the TMDL development process. I imposed upon the EPA a deadline—May 5, 2007—for development of "all necessary TMDLs" for each WQLS listed by the State of Montana. I also required the EPA to develop a schedule for completing the necessary TMDLs and imposed a condition that the EPA not issue new permits or permits allowing increased discharge under the National Pollutant Discharge Elimination System permitting process until "all necessary TMDLs" were completed for any WQLSs affected by such permits. Subject to these guiding conditions, the case was remanded to the EPA for further agency action. *See* Order and Judgment of June 21, 2000.

*B. Motions to Amend the Judgment of June 21, 2000*

The entire uproar about a stay stems from an overzealous reading of one paragraph from an order. Paragraph six of the Court's Order and Judgment of June 21, 2000, prohibited only the EPA from issuing new permits or increasing the permitted discharge for existing permittees. On July 6, 2000, each party moved to amend the Order and Judgment of June 21. The State of Montana and the Intervenors [1] moved to qualify the Judgment by adding to it the phrase "unless ... WQLSs are removed from the list." I rejected the proposed qualification on the grounds that the statutory scheme contemplates *prompt* formulation of TMDLs for listed WQLSs. In my view, the State's suggested change was a further request to continue the license to do nothing. The imposed remedy was designed to redress the specific APA violation addressing the

[1]. The Department of Environmental Quality of the State of Montana ("the State") is an intervenor, not a defendant. However, because the instant motion was brought by the State, this Order will refer to the State separately from the other Intervenors.

EPA's longstanding failure to reject Montana's submission of an inadequate number of TMDLs, a fact that seriously impaired Montana's ability to ensure water quality for over twenty years.[2] Moreover, to allow WQLSs to be deleted from the list would make it impossible for the EPA to know what, precisely, it must accomplish by May 5, 2007.

In short, the proposed qualification would have defeated the specific remedy for decades of TMDL procrastination by muddying the § 303(d) list of impaired waters.

Plaintiffs also moved to amend the Judgment to reach not only the EPA but also the State of Montana. This is because the EPA is not ordinarily the party responsible for issuing permits. The EPA delegated that task to the State. Consequently, to preserve the intention of the Order, I amended paragraph six in the way suggested by Plaintiffs. The amended order simply required that neither the State nor the EPA should issue new or broader permits that might impair water quality before "all necessary TMDLs" were developed. The Order was so amended on September 21, 2000. In making the technical amendment to paragraph 6, the provision remanding the case to the EPA remained unchanged.

On October 13, 2000, the State moved to stay the Order and Judgment of September 21 pending appeal. With its motion, it submitted affidavits from three state employees who had knowledge of the impacts of the Court's Order. The motion and brief presented a draconian view of the case status, suggesting a virtual financial and employment collapse that would result

from the State's interpretation of the Court's Order.[3] On October 19 and 30, 2000, orders were issued allowing Plaintiffs to depose the State's affiants. On November 2, 2000, Plaintiffs lodged draft copies of those depositions.[4] The issue was fully briefed on November 2, 2000. I listened to oral argument on November 3, 2000. From the outset, it has been clear the State overreacted to what seemed to be straight forward to me.

## II. Analysis

The motion for a stay pending appeal is directed at the following provision of the Court's Amended Order and Judgment of September 21, 2000 (with emphasis added):

6. Until all necessary TMDLs are established for a particular WQLS, neither the EPA nor the State of Montana shall issue *any new permits* or increase permitted discharge for any permittee under the National Pollutant Discharge Elimination System permitting program or under the Montana Pollutant Discharge Elimination System permitting program.

### A. The Parties' Positions

The State argues that this paragraph (1) constitutes an injunction, and (2) will cause irreparable harm, because it prevents the State from issuing point source discharge permits as part of federally funded highway construction projects. In response to the Order, on September 29, 2000, the State rashly canceled $28 million in highway construction contracts.[5] The State made rushed estimates that another $240 million in future highway construction pro-

---

2. If a WQLS ceased to be impaired, presumably the EPA would find that no TMDLs were "necessary."

3. Some even characterized this catastrophe as being precipitated by "radical environmentalists." In my view, citizens who have watched the degradation of a precious resource for 28 years are not radical in temperament or policy when they seek to make government agencies comply with the law enacted by the Congress.

4. The same copies had already been circulated to opposing counsel. Plaintiffs may move for permission to file certified copies, but the Court has read and relied on the lodged draft copies.

5. Of the canceled contracts, some did not even contemplate projects on listed WQLSs and some contemplated projects in Indian country which would not be subject to the order.

jects will "either be prohibited from starting or will not be let." State's Brief at 6; Gilmore Affidavit at ¶ 7. Having jumped to an erroneous belief the State now concludes that a stay pending appeal is necessary.

The Intervenors argue that the questioned Order erroneously intrudes on the EPA's and the State's discretion over discharge permits. The EPA concurs but also logically points to certain limitations on the Order, for instance, its "belief" that the Order would not affect waterbodies that do not appear on the 1996 § 303(d) list.[6]

Plaintiffs believe that the Order does not apply to the 1997 permit that covers highway construction projects, the General Discharge for Storm Water Associated with Construction Projects. This too is a logical reading of the language that limits the paragraph to "new permits." Plaintiffs also point out that neither the State, nor the EPA, nor any of the Intervenors consulted with them to determine their interpretation of the Order. *See* Plaintiffs' Brief at 7; Gilmore Depositions at 27, 28. Plaintiffs argue that the harms perceived by the State are largely self-inflicted.

### B. Requirements for a Stay Pending Appeal

■ If paragraph six is an injunction, the motion falls under Rule 62(c). If paragraph six is not an injunction, the State's request for a stay pending appeal would fall under Fed.R.Civ.P. 62(d). In considering whether to issue a stay, I must consider (1) the likelihood of the movant's success on the merits; (2) the likelihood of irreparable injury absent a stay; (3) the likelihood of substantial injury to other parties interested in the proceedings; and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) (Rule 62(c)).

### 1. Likelihood of Success on the Merits

■ While the EPA argues that it and the State are likely to succeed on the merits, the major premise of the argument is that the Court's Order interferes with Agency discretion. "[T]he proper remedy, given the narrow APA liability finding, would have been a remand to EPA." EPA Brief at 6. That is what I did. The Order reads: "This case is REMANDED to the Environmental Protection Agency for further proceedings consistent with this Opinion and Order." Order and Judgment of June 21, 2000, at ¶ 7.

There is a deadline for completion of all TMDLs that the EPA finds "necessary" for Montana's 1996 WQLS list. Order of June 21, 2000, at 9, ¶ 1. The deadline is already binding on the State. *See* Mont. Code Ann. § 75–5–703(3) (1999). I also required the EPA to establish a schedule in its discretion that would enable the agency to meet the deadline. Order of June 21, 2000, at 9–10, ¶ 2. What TMDLs are "necessary," what should be the contents of each TMDL, and whether proposed permits will or will not affect a particular WQLS's impairment, are matters left to the State's and the EPA's discretion.

The EPA, the State, and the Intervenors all argue that the Court's "injunction" is not permitted by the Clean Water Act. The problem with this argument is that the Court's Order does not "enjoin" anything. It directs the State and the EPA to consider the pace of TMDL development because the law requires that they do so. It acknowledges that neither the State nor the EPA know how much of an impairing pollutant a WQLS can take before its quality further declines. In order to ascertain that permits that would further compromise the quality of a WQLS are not issued, it directs the State and the EPA to complete the TMDLs they consider "necessary" before issuing new or increased-dis-

---

**6.** It is difficult to understand how the Order applies to waterbodies that do not appear on the 1996 § 303(d) list.

charge permits. Ordering an agency to comply with the law and placing control over all the means for doing so in its hands does not amount to an "injunction."

Although the Clean Water Act does not require completion of TMDLs before permits can be issued, it certainly contemplates that TMDLs for the first pollutants identified by the EPA would be completed by June 26, 1979. 33 U.S.C. § 1313(d)(2). Every new or increased-discharge permit issued for a WQLS site after June 26, 1979, would have and should have been preceded by a TMDL. Because the State failed to act for twenty-eight years, it has very few TMDLs for its WQLSs.[7] To require the State to develop TMDLs before it issues new or increased-discharge permits is to require the State to proceed in the fashion it should have proceeded had it complied with the law for the past twenty-eight years. A requirement to abide by the law is not an "injunction."

The State argues that compilation of a TMDL meeting the requirements of state law takes a long time. The Order I issued does not require that TMDLs meet the requirements of state law; it requires that TMDLs be formulated in accordance with federal law. For each WQLS on Montana's 1996 § 303(d) list, the State and the EPA must formulate TMDLs that meet federal standards by May 5, 2007. That date is not arbitrary nor is it one Plaintiffs are entirely happy with. It is a date acknowledged by the Montana Legislature to be a reasonable time to complete the obligation at hand. If the State must go further and improve on those TMDLs after they have met federal standards, the Court's Order does not prevent it from doing so.

The Order does not intrude on agency discretion and it does not violate the law. The State is not likely to succeed on the merits so the entry of a stay would be improvident for that reason alone.

*2. Likelihood of Irreparable Harm Absent Stay*

Plaintiffs discovered, upon deposing the State's affiants, that the State has taken *no* measures to comply with the Court's Order. In fact, in the year since the Court found that the EPA violated the Administrative Procedures Act by failing to consider the pace at which TMDLs are developed, the State has not completed a single TMDL. Even when it has the fullest possible range of discretion, the State seems unable to act. These facts indicate that it is Plaintiffs, and the general public, who will suffer irreparable harm if a stay is granted.

The State argues that the only action capable of preventing the irreparable injury it fears is the Court's issuance of a stay. However, in considering the argument about irreparable harm, it must be reasoned "*absent* a stay." Other courses of action readily present themselves. The State may identify and prioritize those WQLSs where projects that will require permits are contemplated and develop TMDLs for those WQLSs first. *See* Reid Deposition at 12; Plaintiffs' Exhibit E. The State's seven-year plan for developing TMDLs may provide for a process by which TMDLs on project-priority WQLSs can be accelerated. Plaintiffs point out that new permits or requests for increased discharge entail a 180–day waiting period. Reid Deposition at 36. The State and the EPA will have ample time to prepare the TMDLs they deem "necessary" whenever the State contemplates any kind of project that might require new or increased-discharge permits, provided they act promptly. Absent a stay there are many alternatives available to the State that would minimize or prevent the harm it claims is irreparable.

For the same reasons, the State has not shown "irreparable injury." It has shown only that it hastily canceled contracts with-

---

**7.** With 3000 TMDL's to go, it will be far into the next millennium before the job is complete at the current pace.

out consulting either the Plaintiffs or the Court about the meaning of the Amended Order and Judgment of September 21, 2000.

The highway construction projects the State contemplates do not require "new permits" or permits that allow increased discharge for storm water discharge. They are covered by routine authorizations under the existing General Storm Water Montana Pollutant Discharge Elimination System Permit. That permit was issued in 1997. Theoretically, it accommodates a certain total quantity of unintended discharge of sediment over a five-year period from non-point sources—such as construction projects. Authorization letters, not permits, are issued under the General Storm Water permit. The State has never denied authorization to the Montana Department of Transportation or to a contractor. See Reid Deposition at 17; Gilmore Deposition at 34. Plaintiffs assert, and the State concedes, that they have never threatened to enforce the Order against such authorizations. The State's conclusion to read the Order as applying to storm water discharge, a mistaken reading under the 1997 permit, was its own decision, not the Court's.

The State also claims that its regulation of Concentrated Animal Feeding Operations (CAFOs) would be adversely affected by the Order. A majority of CAFOs fall under the general CAFO permit, similar to the General Storm Water Discharge Permit. However, the State does not know whether any of the CAFOs it wants to regulate are located on WQLSs or whether their discharges are covered under the general permit for CAFOs or whether they are illegally polluting. Reid Deposition at 26–30. Again, it seems as if the State decided to interpret the Order in a way it felt would create the worst harm and overlooked what the Order says.

While paragraph six of the Amended Order and Judgment of September 21, 2000, applies to point-source permits, the State can anticipate needs for point-source permits at least six months in advance, because the approval process for such a permit takes at least that long. Reid Deposition at 37–38. The State can take more time, if it wishes. Id. In the case of the forty or so wastewater treatment facilities currently in development, the State has as much as two or three years to develop the TMDLs that it and the EPA determine are "necessary" for any WQLSs affected by those projects. None of these projects has reached the stage of applying for a storm water discharge authorization, much less a point-source discharge permit. Teegarden Deposition at 14. The State does not know at this early stage whether a new point-source discharge permit will even be necessary for those projects. Even though such permits might be necessary, and even though the State understands that permits could be issued as soon as the necessary TMDLs are completed,[8] the waste water section of the State's Department of Environmental Quality has not requested the planning section to begin preparation of the necessary TMDLs. Teegarden Deposition at 17.

The State has failed to show that it will suffer irreparable harm absent a stay. In fact, a concession was made at oral argument that if the Order is correctly read, there would be minimal disruption of the agency's function and less impact on projects being considered.

### 3. Injury to Other Parties

The State has shown little prospect of damage as a result of requiring it to develop TMDLs for WQLSs that will be impacted by construction or other projects before issuing new or increased-discharge permits for those projects. The State's alleged harm is exaggerated. The Intervenors' projections of harm are as exaggerated as the State's and the EPA's.

8. "[I]f an approved TMDL were completed and approved by EPA, then we can go ahead and issue the permit on a water quality limited stream." Reid Deposition at 12.

By contrast, a stay of the Order and Judgment would delay for more years the State's and the EPA's progress toward fulfillment of their statutory duty. The State's and the EPA's failure to do their jobs means that "pollutant discharges into Montana's waters have not been properly assessed, controlled, or monitored. There is no way to assess the damage caused by this delay." Order of June 21, 2000, at 7. The twenty-eight year dereliction argues eloquently in Plaintiffs' favor. Given this history and the State's recalcitrance in the year since the Order finding an APA violation, I seriously question whether the State and the EPA would complete the TMDLs by May 5, 2007, if a stay pending appeal were granted. This factor weighs against a stay.

*4. Public Interest*

The State asserts that a stay would serve the public interest because the construction industry is vital to Montana's economy. This argument is not persuasive. The Clean Water Act benefits all Montanans. This is particularly so if its mandate is complied with as the law requires. The public interest is best served by prompt action, even any meaningful action, on the part of the State and the EPA to comply with the law's charge. A stay is not in the public interest.

### III. Conclusion

Instead of trying in a meaningful way to comply with the law, the State wants to further postpone its obligations under the Clean Water Act. Granting a stay would, in effect, condone the State's continued dereliction of duty. I will not accept the State's invitation to further delay.

Accordingly, IT IS HEREBY ORDERED that the State's motion for a stay pending appeal (dkt # 167) is DENIED.